ELECTRONIC CITATION:  2001 FED App. 0002P (6th Cir.)
File Name:  01b0002p.06

**BANKRUPTCY APPELLATE PANEL OF THE SIXTH CIRCUIT**

| | |
|---|---|
| In re:  MICHAEL N. VITANOVICH, JR., ) | |
| ) | |
| Debtor. ) | |
| _____ ) | |
| ) | |
| MELLON BANK, N.A., ) | |
| ) | |
| Plaintiff-Appellee, ) | |
| ) | |
| v.  ) | No. 00-8028 |
| ) | |
| MICHAEL N. VITANOVICH, JR., ) | |
| ) | |
| Defendant-Appellant. ) | |
| ) | |
| _____ ) | |

Appeal from the United States Bankruptcy Court
for the Northern District of Ohio at Youngstown.
No. 98-43173, Adv. No. 99-4007.

Argued: January 10, 2001

Decided and Filed:  March 21, 2001

Before:  AUG, BROWN, and RHODES, Bankruptcy Appellate Panel Judges.

_____

**COUNSEL**

**ARGUED:**  John P. Lacher, Pittsburgh, Pennsylvania, for Appellant.  Thomas E. Reilly, Pittsburgh, Pennsylvania, for Appellee.  **ON BRIEF:**  Robert O. Lampl, Pittsburgh, Pennsylvania, for Appellant.  Thomas E. Reilly, Pittsburgh, Pennsylvania, for Appellee.



**OPINION**

J. VINCENT AUG, JR., Bankruptcy Appellate Panel Judge. The bankruptcy court found that the Debtor, Michael N. Vitanovich, Jr. ("Debtor"), had engaged in a classic check kiting scheme and that the debt owed by Debtor to Mellon Bank, N.A. ("Mellon Bank") in the amount of $12,806.00 is nondischargeable under 11 U.S.C. § 523(a)(2)(A). We AFFIRM.

## I.   ISSUES ON APPEAL

1.  Whether the bankruptcy court erred in finding the debt to be nondischargeable under 11 U.S.C. § 523(a)(2)(A).

2.  Whether the bankruptcy court erred in finding that the Debtor had engaged in a check kiting scheme.

## II.   JURISDICTION AND STANDARD OF REVIEW

The bankruptcy court's order regarding nondischargeability is final and appealable by right under 28 U.S.C. § 158(a)(1). *National City Bank v. Plechaty (In re Plechaty)*, 213 B.R. 119, 121 (B.A.P. 6th Cir. 1997).

The bankruptcy court's order regarding nondischargeability is a mixed question of law and fact. The appellate court reviews the conclusion of law de novo but the findings of fact under a clearly erroneous standard. *See Holiday Inns, Inc. v. 800 Reservation, Inc.,* 86 F.3d 619, 623 (6th Cir. 1996) (discussing mixed question of law and fact under Lanham Act). De novo means that the appellate court determines the law independently of the trial court's determination. *Belfance v. Bushey (In re Bushey)*, 210 B.R. 95, 98 (B.A.P. 6th Cir. 1997) (citation omitted). "A finding of fact is clearly erroneous 'when although there is evidence to support it, the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been committed.'" *R.D.F. Devs. Inc. v. Sysco Corp. (In re R.D.F. Devs. Inc.)*, 239 B.R. 336, 338-39 (B.A.P. 6th Cir. 1999) (quoting *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S. Ct. 1504, 1511 (1985) (additional citations omitted)).

## III. FACTS

The Debtor conducted business or was employed as office manager for both East Coast Auto Group ("Auto Group") located in Youngstown, Ohio, and East Coast Motor Cars, Inc. ("Motor Cars") located in Pittsburgh, Pennsylvania.

On August 20, 1997, the Debtor opened a checking account for Auto Group at PNC Bank in Pittsburgh. The Debtor used his mother's address in Campbell, Ohio as the mailing address for Auto Group on the PNC account.

On October 7, 1997, the Debtor opened a checking account for Motor Cars at Mellon Bank in Pittsburgh. His initial $19,000.00 deposit into that account was a check written on the PNC account payable to Ohio Auto Group, another entity at which the Debtor had worked, but which apparently went out of business several years earlier.

One day later, on October 8, 1997, the Debtor withdrew $18,255.00 and $26,000.00 from the Motor Cars/Mellon account, placing the account in a substantially overdrawn position. The $26,000.00 item was a check payable to Auto Group and deposited into the PNC account. The $18,255.00 withdrawal was used to cover cashier's checks written to various creditors.

On October 9, 1997, the Debtor deposited $27,000.00 into the Motor Cars/Mellon account. This deposit was a check payable to Auto Group and not Motor Cars. The same day, the Debtor withdrew $20,500.00 from the Motor Cars/Mellon account, leaving the account still substantially overdrawn. This $20,500.00 was deposited into the Auto Group/PNC account.

The next day, October 10, 1997, the Debtor deposited $20,500.00 and $29,000.00 into the Motor Cars/Mellon account. These deposits were checks drawn on the Auto Group/PNC account. The same day, the Debtor withdrew $20,650.00 from the Motor Cars/Mellon account and deposited it into the Auto Group/PNC account.

On October 14, 1997, the Debtor obtained two cashier's checks on the Motor Cars/Mellon account for $8,885.00 and $1,712.60 for payments owed to creditors.

On October 15, 1997, Debtor withdrew an additional $41,480.00 from the Motor Cars/Mellon account and obtained five cashier's checks for payments to creditors.[1]

---

[1] During the trial on this matter, counsel for Mellon Bank referred to the five cashier's checks as Exhibit R and indicated that the total amount of the five cashier's checks was approximately $24,000.00 Debtor agreed with that approximate total. (App. at 132a-133a). However, in reviewing Exhibit R, we calculate that the total of the five checks is $41,480.00. (App. at 48a-49a). Of the $41,480.00 amount, $8,000.00 was paid to Land Yacht, yet another company

On October 16, 1997, the $20,500.00 check written on October 9, 1997, was returned by PNC Bank for insufficient funds.

On October 22, 1997, the $29,000.00 check written on October 19, 1997, was returned by PNC Bank for insufficient funds.

Once all the checks written for insufficient funds were returned, the Debtor had, in less than two weeks, accrued a negative balance in the Motor Cars/Mellon account in the amount of $45,806.00.

After the Debtor was contacted by a Mellon Bank representative concerning the negative balance, on October 31, 1997, he gave Mellon Bank a cashier's check for $23,000.00 and on November 4, 1997, the Debtor gave Mellon Bank two additional cashier's checks totaling $10,000.00, thus reducing the negative balance in the Motor Cars/Mellon account to $12,806.00.

Following a trial, the bankruptcy court found the $12,806.00 amount to be nondischargeable under 11 U.S.C. § 523(a)(2)(A). The bankruptcy court's decision was based on its findings that the Debtor had engaged in a fraudulent check kiting scheme and that the Debtor did not intend to pay the face amounts of the kited checks upon their dishonor. This timely appeal followed.

## IV.    DISCUSSION

Analysis of "actual fraud" under 11 U.S.C. § 523(a)(2)(A).

Section 523 provides:

> (a)    A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–
>
>     . . .
>
> (2)    for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by–
>
> (A)    false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A).

---

for which the Debtor worked.

In its memorandum opinion, the bankruptcy court conducted a very thorough and thoughtful analysis using the elements laid out in *Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 280-81 (6th Cir. 1998). In its analysis, the bankruptcy court addressed how the check kiting scheme in which the bankruptcy court found the Debtor had engaged constituted a material misrepresentation in light of the Supreme Court's pronouncement in *Williams v. United States*, 458 U.S. 279, 284-85, 102 S. Ct. 3088, 3091-92 (1982) that a "check is not a factual assertion." We agree with the bankruptcy court's determination that the debt owed to Mellon Bank is nondischargeable under 11 U.S.C. § 523(a)(2)(A). However, we believe that the case of *McClellan v. Cantrell*, 217 F.3d 890 (7th Cir. 2000), decided subsequent to the bankruptcy court's memorandum opinion entered in this case, announces a better approach to these types of cases by analyzing the use of the term "actual fraud" in 11 U.S.C. § 523(a)(2)(A).

In *McClellan*, the Court of Appeals for the Seventh Circuit stated that "section 523(a)(2)(A) is not limited to 'fraudulent misrepresentation.'" *McClellan*, 217 F.3d at 893. "[B]y distinguishing between 'a false representation' and 'actual fraud,' the statute makes clear that actual fraud is broader than misrepresentation." *Id*. *McClellan* acknowledges that many cases have assumed "that 'actual fraud' involves a misrepresentation." *Id*. However, such a restricted definition is not required, as actual fraud encompasses "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." *Id*. (citing 4 LAWRENCE P. KING, COLLIER ON BANKRUPTCY ¶ 523.08[1][e], at 523-45 (15th ed. rev. 2000)). *McClellan* went on to explain

> "Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated."

*Id*. (quoting *Stapleton v. Holt*, 250 P.2d 451, 453-54 (Okla. 1952)).

> "Actual fraud has been defined as intentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed. It requires intent to deceive or defraud."

*Gerad v. Cole (In re Cole)*, 164 B.R. 951, 953 (Bankr. N.D. Ohio 1993) (quoting *United States v. Lichota*, 351 F.2d 81, 90 (6th Cir. 1965).

We adopt the position of the Court of Appeals for the Seventh Circuit that actual fraud as used in 11 U.S.C. § 523(a)(2)(A) is not limited to misrepresentations and misleading omissions. *McClellan*, 217 F.3d at 893. When a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code.

This position is consistent with the decision of the Court of Appeals for the Sixth Circuit in *In re Rembert* that a debtor's subjective intent at the time the debt is incurred is critical in proving fraud. *In re Rembert*, 141 F.3d at 280-81. *In re Rembert* involved the issue of whether the debtor had made an intentional misrepresentation by running up the debt on her credit cards to feed her gambling habits. Actual fraud was not asserted in *In re Rembert*. As noted by the court in *McClellan*, there are numerous cases, including the Supreme Court case of *Field v. Mans*, 516 U.S. 59, 116 S. Ct. 437 (1995), in which the only fraud charged was misrepresentation. *McClellan*, 217 F.3d at 892-93. The plain language of 11 U.S.C. § 523(a)(2)(A) distinguishes between "false representation" and "actual fraud." *McClellan*, 217 F.3d at 893. Actual fraud is broader than misrepresentation. *Id*. Therefore, the cases involving only false representation, misrepresentations and/or omissions by debtors are distinguishable from the case at bar, involving actual fraud.

<u>The bankruptcy court's finding that the Debtor had engaged in a classic check kiting scheme is not clearly erroneous</u>.

The bankruptcy court determined that the Debtor engaged in a check kiting scheme with the intent to defraud Mellon Bank. The Court of Appeals for the Sixth Circuit has defined "check kiting" as follows:

> Check kiting consists of drawing checks on an account in one bank and depositing them in an account in a second bank when neither account has sufficient funds to cover the amounts drawn. Just before the checks are returned for payment to the first bank, the kiter covers them by depositing checks drawn on the account in the second bank. Due to the delay created by the collection of funds by one bank from the other, known as the "float" time, an artificial balance is created.

*United States v. Stone*, 954 F.2d 1187, 1188, n.1 (6th Cir. 1992).

There is overwhelming circumstantial evidence in this case that the Debtor engaged in a check kiting scheme. Specifically, this evidence includes, the multiple transactions between the Motor Cars/Mellon account and the Auto Group/PNC account,[2] the dollar amounts of those transfers, the timing of those transfers, the timing of the opening of the two accounts, the unexplained initial deposit into the Motor Cars/Mellon account with a check payable to a defunct company, the Debtor's apparent control over the two accounts, and the Debtor's peculiar use of his mother's address for one of the checking accounts. In view of this evidence, the bankruptcy court's finding that the Debtor engaged in a classic check kiting scheme is not clearly erroneous.

The Debtor contends that the bankruptcy court provided an insufficient analysis of the Debtor's activities to justify its conclusion that the Debtor was kiting checks. The Debtor's checking activities were painstakingly set out by Mellon Bank's counsel at the trial. It is not necessary for the bankruptcy court to repeat the date and amount of each and every transaction in its opinion when the evidence is in the record.

The Debtor also contends that the "overdraft" situation was the result of a hold placed on the Auto Group/PNC account, thereby causing the October 10, 1997, $20,500.00 and $29,000.00 deposits into the Motor Cars/Mellon account to "bounce." This contention is not supported by the evidence. Although the Auto Group/PNC account had a positive balance of approximately $17,000.00 at the end of October 1997, the account had a negative balance at the time period in question.

The Debtor also suggests that Mellon itself was at fault. Although Mellon did incorrectly "encode" some checks written by the Debtor,[3] this was not the cause of the overdrawn account. Furthermore, the bankruptcy court found the Debtor's testimony to be not credible in this regard.

A check kiting scheme falls into the broad definition of "actual fraud" as defined above. In fact, the Sixth Circuit has held that check kiting is a "scheme or artifice . . . 'to

---

[2] The records shows that Vitanovich wrote at least six checks back and forth between Mellon Bank and PNC Bank within the first two weeks that the Mellon account was open. In that same two week period, the Mellon Bank account was overdrawn by $45,806.00. Three checks totaling $67,150.00 were written on the Mellon Bank account and deposited into the PNC account. Two checks totaling $49,500.00 were written on the PNC account and deposited into the Mellon account, both checks were returned for insufficient funds.

[3] Mellon promptly corrected the error.

defraud a financial institution'" under the federal bank statute. *Stone*, 954 F.2d at 1190. (quoting 18 U.S.C. § 1344).

The bankruptcy court found that the Debtor had engaged in actual and intentional acts of fraud involving moral turpitude and bad faith and that Debtor actually intended to defraud Mellon Bank. The Debtor denied that he did not intend to pay the face amount of the checks. However, the bankruptcy court's assessment of the credibility of the Debtor as a witness led the bankruptcy court to determine that his statements regarding his intent were simply not credible. Federal Rule of Bankruptcy Procedure 8013 accords great deference to the bankruptcy court's determinations as to the credibility of a witness. *See* FED. R. BANKR. P. 8013 ("due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses"). The bankruptcy court's findings that the Debtor engaged in a check kiting scheme with intent to defraud are not clearly erroneous.

## V.  CONCLUSION

The check kiting scheme engaged in by Debtor constituted actual fraud and the debt is nondischargeable under § 523(a)(2)(A). The order of the bankruptcy court is **AFFIRMED**.