ELECTRONIC CITATION:  2007 FED App. 0007P (6th Cir.)
File Name:  07b0007p.06

**BANKRUPTCY APPELLATE PANEL OF THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| In re:  ROBERT R. FOX, | ) | |
| | ) | |
| Debtor. | ) | |
| ———————————————— | ) | |
| | ) | |
| CASH AMERICA FINANCIAL SERVICES, INC., | ) | |
| | ) | |
| | ) | No. 06-8043 |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT R. FOX, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| ———————————————— | ) | |

Appeal from the United States Bankruptcy Court
for the Northern District of Ohio, Eastern Division, at Youngstown.
Case No. 03-46394, Adv. No. 04-4072.

Argued: February 7, 2007

Decided and Filed:  June 13, 2007

Before: GREGG, LATTA, and PARSONS, Bankruptcy Appellate Panel Judges.

————————————

**COUNSEL**

**ARGUED:**  John J. Rutter, ROETZEL & ANDRESS, Akron, Ohio, for Appellant.  Richard G. Zellers, RICHARD G. ZELLERS & ASSOCIATES, Canfield, Ohio, for Appellee.  **ON BRIEF:** John J. Rutter, John W. Becker, Bruce R. Schrader, ROETZEL & ANDRESS, Akron, Ohio, for Appellant.  Richard G. Zellers, Melody Dugic Gazda, RICHARD G. ZELLERS & ASSOCIATES, Canfield, Ohio, for Appellee.

---

## OPINION

---

JAMES D. GREGG, Bankruptcy Appellate Panel Judge. Cash America Financial Services, Inc. ("Appellant") appeals the bankruptcy court's judgment holding that Robert R. Fox ("Debtor") was not personally liable for the debt owed to the Appellant by the Debtor's corporation, R.R. Fox, Inc. ("R.R. Fox"). In so holding, the bankruptcy court rejected the Appellant's claim that the debt should be excepted from the Debtor's discharge under §§ 523(a)(4) or (a)(6) of the Bankruptcy Code.[1] For the reasons that follow, the bankruptcy court's judgment is AFFIRMED.

## I. ISSUES ON APPEAL

This appeal involves two interrelated issues: whether the Debtor, as President of R.R. Fox, engaged in tortious conduct giving rise to personal liability for the damages suffered by the Appellant as a result of its business relationship with R.R. Fox and whether the Debtor's actions or omissions constituted defalcation while acting in a fiduciary capacity or embezzlement under § 523(a)(4), or willful and malicious injury under § 523(a)(6), resulting in a nondischargeable debt.

## II. JURISDICTION AND STANDARD OF REVIEW

The Bankruptcy Appellate Panel of the Sixth Circuit ("BAP") has jurisdiction to decide this appeal. The United States District Court for the Northern District of Ohio has authorized appeals to the BAP, and a final order of the bankruptcy court may be appealed by right under 28 U.S.C. §158(a)(1). For purposes of appeal, an order is final if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798, 109 S. Ct. 1494 (1989) (citations omitted). "A bankruptcy court's judgment determining dischargeability is a final and appealable order." *Hertzel v. Educ. Credit Mgmt. Corp.*

---

[1] The Bankruptcy Code is contained in 11 U.S.C. §§ 101-1330. Unless stated to the contrary, all future statutory references are to the Bankruptcy Code, e.g., "§ ____."

*(In re Hertzel)*, 329 B.R. 221, 224-25 (B.A.P. 6th Cir. 2005) (citing *Cundiff v. Cundiff (In re Cundiff)*, 227 B.R. 476, 477 (B.A.P. 6th Cir. 1998)).

"Determinations of dischargeability under 11 U.S.C. § 523 are conclusions of law reviewed de novo." *Bailey v. Bailey (In re Bailey)*, 254 B.R. 901, 903 (B.A.P. 6th Cir. 2000) (citation omitted). "De novo means that the appellate court determines the law independently of the trial court's determination." *O'Brien v. Ravenswood Apartments, Ltd. (In re Ravenswood Apartments, Ltd.)*, 338 B.R. 307, 310 (B.A.P. 6th Cir. 2006) (quoting *Treinish v. Norwest Bank Minn., N.A. (In re Periandri)*, 266 B.R. 651, 653 (B.A.P. 6th Cir. 2001)). The factual findings underlying the bankruptcy court's dischargeability ruling are upheld on appeal unless they are clearly erroneous. *In re Hertzel*, 329 B.R. at 225 (citations omitted); *see also Van Aken v. Van Aken (In re Van Aken)*, 320 B.R. 620, 622 (B.A.P. 6th Cir. 2005) (dischargeability determinations present mixed questions of law and fact; the bankruptcy court's conclusions of law are reviewed de novo, while findings of fact are reviewed for clear error). "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been committed." *Rogan v. Bank One, N.A. (In re Cook)*, 457 F.3d 561, 565 (6th Cir. 2006) (citing *Simon v. Chase Manhattan Bank (In re Zaptocky)*, 250 F.3d 1020, 1027 (6th Cir. 2001)).

## III. FACTS

R.R. Fox, a debt collection agency, was incorporated in 1990. In 1993, the Debtor and his wife became R.R. Fox's only directors, each owning one half of the shares of the corporation. The Debtor also served as the corporation's President and Chief Operating Officer. In this capacity, the Debtor oversaw R.R. Fox's operations and made financial decisions on its behalf.

The Appellant provides short-term, or "pay day," loans to consumers who may not have access to traditional credit sources. When a loan is not timely repaid, and its internal collection efforts are unsuccessful, the Appellant frequently assigns the account to a third party debt collection agency. On or around January 10, 2003, the Appellant entered into one such Agreement for Collection with R.R. Fox ("Agreement"). Under this Agreement, the Appellant was to provide information related to debts owed it ("Accounts") to R.R. Fox, and R.R. Fox was to collect on the Accounts. The Agreement entitled R.R. Fox to a fee equal to one-quarter of the total amount

collected. On or before the fifth day of each calendar month, R.R. Fox was contractually required to deliver all sums it collected on Accounts during the previous month, less its fee, to the Appellant. The Agreement stated that it was to be construed in accordance with the laws of Texas.

Three provisions in the Agreement are particularly germane to this appeal. Paragraph 3, titled "Surety Bond," states:

> [R.R. Fox] agrees that it will maintain a surety bond in the amount of $10,000 or such other amount as may be required by [the Appellant] (provided, however, that the amount of the surety bond shall not exceed the total sum of the Accounts then in the possession of [R.R. Fox]). Such bond shall be renewable annually on January first of each year, shall be approved by [the Appellant] as to form and content, and shall be executed by [R.R. Fox] as principal and by a surety company as surety. The bond shall run to and be for the benefit of [the Appellant] as obligee and conditioned that [R.R. Fox] shall faithfully and truly perform all of its obligations under this Agreement and shall, within five (5) days after the close of each calendar month, account to and pay to [the Appellant] the net proceeds of all collections made during the preceding calendar month. [R.R. Fox] shall provide [the Appellant] with a copy of the bond upon [the Appellant's] request.

(J.A. at 184.)

Paragraph 6, entitled "Trust Account," states:

> [R.R. Fox] shall hold all sums that it collects for the benefit of [the Appellant] in a trust account ("Trust Account") until such time as the funds are paid to [the Appellant] pursuant to paragraph 7. The Trust Account shall be maintained separate and apart from [R.R. Fox's] operating accounts. The Trust Account shall be maintained at a bank, savings and loan association, savings bank, or credit union that is insured by the Federal Deposit Insurance corporation or the National Credit Union Administration. All sums received by [R.R. Fox] in connection with the Accounts shall be placed in the Trust Account within two (2) business days after their receipt by [R.R. Fox]. All sums held by [R.R. Fox] in the Trust Account for the benefit of [the Appellant] shall be free of any right of offset or security interest in favor of the depository institution or any other person or entity.

(J.A. at 185.)

Paragraph 13, entitled "Nature of Relationship," states:

> *This Agreement does not constitute any party hereto as an agent,* legal representative, *fiduciary,* joint venturer, partner, employee, or servant *of the other for any purpose whatsoever.* [The Appellant] and [R.R. Fox] agree that [R.R. Fox] is an independent

contractor. Nothing in this Agreement authorizes [R.R. Fox] to make any contract, agreement, warranty, or representation on [the Appellant's] behalf, or to incur any debt or other obligation in [the Appellant's] name; and [the Appellant] shall in no event assume liability for, or be deemed liable hereunder, as a result of any such action.

(J.A. at 186 (emphasis supplied).)

The Vice President of the Appellant's Pay Day Lending Division, Wayne Gerlosky ("Gerlosky") testified that these provisions were included in the Agreement exclusively for the benefit of the Appellant and to ensure that R.R. Fox satisfied the terms and conditions of the Agreement. More specifically, Gerlosky explained that the "Trust Account" provision was intended to protect the Appellant's interest in the proceeds that R.R. Fox collected for its benefit by preventing R.R. Fox from commingling funds belonging to the Appellant with its general operating funds. He also stated that this provision was important to the Appellant because it assisted the Appellant in accounting for funds that were due it under the Agreement. Finally, Gerlosky testified that the "Nature of Relationship" paragraph was included in the Agreement "[t]o ensure that [the Appellant was] not bound by any actions that R.R. Fox took outside of [the Agreement]."[2] (J.A. at 28.)

It is undisputed that the Debtor neither acquired a surety bond nor established a separate trust account as required by the Agreement. According to the Debtor, he failed to create the trust account because he did not know what a trust account was. On the Friday before the first Accounts were to be downloaded, the Debtor contacted his "business banker" at Bank One to set up the account. Allegedly, neither the business banker nor the branch manager had any "idea what [the Debtor] was talking about." (J.A. at 103-04.) The Debtor stated that the trust account the bank wanted to set up was "maybe for an heir, as a child or future generation." (J.A. at 104.) When asked to provide a copy of the surety bond that same afternoon, the Debtor sent a copy of the "dec. page" from R.R. Fox's commercial insurance policy instead. Despite the Debtor's failure to provide adequate evidence of the surety bond, the Appellant proceeded to download Accounts to R.R Fox the following Monday.

---

[2] During oral argument and at trial, the Appellant acknowledged that it had drafted the Agreement. Even if Gerlosky's interpretation of the Agreement is given credence, it does not explain why the Appellant included the first sentence of paragraph 13.

Gerlosky acknowledged that he knew R.R. Fox had failed to establish the trust account. He explained that the Appellant assigns the responsibility to determine whether third-party debt collection agencies have set up trust accounts to third-party administrators. Those administrators are also responsible for monitoring the collection activity. Although Gerlosky contacted the third party administrator about R.R. Fox's failure to establish the trust account, he never directly contacted the Debtor. Importantly, despite Gerlosky's knowledge that there was no segregated account, the Appellant continued to download Accounts to R.R. Fox during January and February of 2003.[3]

The Debtor testified that the Appellant sent Accounts totaling approximately five million dollars to R.R. Fox in February 2003. The uncontested evidence at trial established that R.R. Fox did not remit any payment for its January collections to the Appellant on February 5, 2003. Instead, it untimely remitted payment for its January collections, in the amount of $30,693.70, to the Appellant on March 6, 2003. R.R. Fox did not remit any payment on this date for its February collections.

The record on appeal does not indicate that R.R. Fox's failure to timely remit payments to the Appellant directly caused the later breakdown in the parties' business relationship. To the contrary, Gerlosky acknowledged that the Appellant typically afforded flexibility to new collection agencies, often by extending reporting and remittance periods by forty-five days. Regardless, at some point prior to March 6, 2003, the Appellant stopped downloading Accounts to R.R. Fox. Approximately one week after remitting the March 6 payment, the Debtor traveled to the Appellant's headquarters in Texas. He attempted to convince the Appellant to resume sending Accounts to R.R. Fox. This effort was unsuccessful. Representatives of the Appellant told the Debtor that there were no Accounts available to download.

During this same time period, R.R. Fox was in the midst of a recruitment campaign which created substantial overhead for the company, including a payroll in the range of $60,000 to $80,000. The Debtor stated that he was "aggressively pursuing as much business as [he] humanly could get"

---

[3] Duane Clark ("Clark") of Compass Recovery, a company that provided portfolio management services to both R.R. Fox and the Appellant, testified that he had several conversations with the Debtor about the requirement of a segregated account. According to Clark, the Debtor assured him that the account was in place, but never provided evidence that the account existed. Clark admitted, however, that his first inquiry about the segregated account occurred after the Appellant stopped downloading Accounts to R.R. Fox in March 2003.

in order to "grow" the company. (J.A. at 133-34.) The Debtor explained that this overhead, coupled with the Appellant's failure to download additional Accounts, eventually caused R.R. Fox to file a chapter 11 petition on April 4, 2003. The case was subsequently converted to chapter 7 on June 18, 2003.

Because R.R. Fox failed to open a segregated account, the proceeds from collections on the Accounts were deposited in R.R. Fox's general operating account. In his testimony, the Debtor admitted that he was "solely responsible for the decision to deposit all of the proceeds collected on [the Appellant's] behalf into the general operating account." (J.A. at 154.)

The Debtor received three separate $20,000 payments from R.R. Fox's general operating account on January 3, 2003, February 3, 2003, and March 6, 2003. At trial, the Debtor testified that these remittances constituted a "return[] on [his] investment" and payment for his consulting services. (J.A. at 111-12.) The Debtor explained that he gave up a $30,000-per-month consulting job during 2002 to purchase R.R. Fox. The Debtor further testified that he borrowed approximately $2.1 million and contributed collection accounts he owned personally to capitalize R.R. Fox. According to the Debtor, the $60,000 came from two sources: financing (which included loans from Bank One and the Small Business Administration) and collections from accounts that he had contributed to R.R. Fox as capital.

The Debtor's testimony at trial regarding the nature of the three payments was not entirely consistent with the testimony he provided at his deposition on October 17, 2005. In his deposition, the Debtor stated that, although he was an independent contractor for R.R. Fox, the company never compensated him for his consulting services. The Debtor stated that R.R. Fox owed him approximately $120,000 for his services, but he believed that he lost his claim for compensation when he filed his individual chapter 7 petition on December 15, 2003. Therefore, he did not file a claim in the R.R. Fox bankruptcy proceeding.

Both parties agree that R.R. Fox's collection efforts from January 10, 2003, through June 18, 2003, resulted in a net total due to the Appellant of $351,726.65. Of this amount, R.R. Fox only paid the Appellant $89,614.27, leaving an outstanding balance of $262,112.38.

The Appellant filed this adversary proceeding on April 2, 2004. The Appellant alleged that the Debtor, as President of R.R. Fox, should be held personally liable for R.R. Fox's debt to the

Appellant. The Appellant further alleged that the Debtor's misappropriation of funds belonging to the Appellant constituted defalcation while acting in a fiduciary capacity, embezzlement, and willful and malicious injury to the Appellant's property. Accordingly, the Appellant asserted that the debt was nondischargeable pursuant to §§ 523(a)(4) and (6).

The adversary proceeding was tried before the bankruptcy court on March 1, 2006. On July 21, 2006, the bankruptcy court entered a memorandum opinion and order rejecting the Appellant's arguments. The court held that the debt did not fall within the exceptions to discharge in either § 523(a)(4) or (a)(6). Addressing the Appellant's claims under § 523(a)(4), the bankruptcy court concluded that there was no fiduciary relationship between the Debtor and the Appellant, and thus, there was no defalcation by a fiduciary. The court also held that the Appellant did not prove embezzlement, inasmuch as it failed to establish the elements of fraud. Finally, the bankruptcy court concluded that the facts established at trial did not support a finding that the Debtor "willfully" converted the proceeds from the Accounts with the requisite intent to cause injury pursuant to § 523(a)(6). Therefore, the bankruptcy court entered judgment in favor of the Debtor. This timely appeal followed.

## IV.    DISCUSSION

To except a debt from discharge in the Debtor's bankruptcy case, the Appellant must establish that the Debtor can be held personally liable for the actions and debts of R.R. Fox. A corporation such as R.R. Fox is a distinct "legal entity that exists separate and apart from its officers, directors, and shareholders." *Lambert v. Kazinetz*, 250 F. Supp.2d 908, 913 (S.D. Ohio 2003) (citing *Zimmerman v. Eagle Mortgage Corp.*, 675 N.E.2d 480, 485 (Ohio App. 1996)). Unless the corporate veil is pierced, general corporate law principles shield officers and directors, like the Debtor, from personal liability for the debts or actions of the separate corporate entity. *Id*. at 914 (citing *Belvedere Condo. Unit Owners' Ass'n v. R.E. Roark Cos.*, 617 N.E.2d 1075, 1085 (Ohio 1993)). Under Ohio agency law, however, "a corporate officer can be held personally liable for a tort committed while acting within the scope of his employment." *Yo-Can, Inc. v. The Yogurt Exch., Inc.*, 778 N.E.2d 80, 90 (Ohio App. 2002) (citation omitted); *see Lambert*, 250 F. Supp.2d at 915 ("[I]f an agent commits a tort in the course of his agency, the fact of agency will not relieve him of

liability, and this is so even though the principal may be liable also.") (quoting *Atram v. Star Tool & Die Corp.*, 581 N.E.2d 1110, 1113 (Ohio App. 1989)). "Ohio law has long held that corporate officers may be held personally liable for actions of the company if the officers take part in the commission of the act or if they specifically directed the particular act to be done, or participated or cooperated therein." *State ex rel. Fisher v. Am. Courts, Inc.*, 644 N.E.2d 1112, 1114 (Ohio App. 1994) (citing *Young v. Featherstone Motors, Inc.*, 124 N.E.2d 158, 165-66 (Ohio App. 1954)). Therefore, to the extent the Debtor engaged in tortious conduct as President of R.R. Fox, or caused R.R. Fox to commit a corporate tort, he may be held personally liable for the resulting injury to the Appellant.[4]

In addition to proving that it was injured by the Debtor's tortious conduct as President of R.R. Fox, the Appellant must establish that the resulting debt is excepted from discharge under § 523(a). Exceptions to discharge are to be narrowly construed in favor of the debtor. *Meyers v. I.R.S. (In re Meyers)*, 196 F.3d 622, 624 (6th Cir. 1999); *Rembert v. AT&T Univ. Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998). The creditor bears the burden of proving each element of its case by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654 (1991).

A. Defalcation by a Fiduciary.

The Bankruptcy Code excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity." 11 U.S.C. § 523(a)(4). A finding of nondischargeability under § 523(a)(4) requires proof of three elements: "(1) a fiduciary relationship; (2) breach of that fiduciary

---

[4] As discussed hereinbelow, the Debtor did not engage in tortious conduct that would render the debt to the Appellant nondischargeable in the Debtor's individual bankruptcy case. Therefore, any potential personal liability for the debt owed to the Appellant by R.R. Fox is subject to the Debtor's bankruptcy discharge. 11 U.S.C. § 727.

The concurrence narrowly focuses upon whether the Debtor may be held personally liable for a breach of contract by R.R. Fox. However, this appeal necessarily encompasses a wider range of issues. The Appellant asserts that the Debtor engaged in nondischargeable tortious conduct. We must therefore review the record and the elements of the various alleged nondischargeable debts. *See, e.g., Board of Trustees v. Bucci*, 351 B.R. 826 (N.D. Ohio 2006) (appellate court discusses elements of defalcation while acting in a fiduciary capacity and embezzlement before agreeing that the debtor merely breached a contractual obligation). If the Appellant proved the Debtor committed an actionable tort, applicable Ohio law would provide the necessary bridge to hold the Debtor personally liable.

relationship; and (3) a resulting loss." *R.E. Am., Inc. v. Garver (In re Garver)*, 116 F.3d 176, 178 (6th Cir. 1997).

The nature of the fiduciary relationship required to trigger liability under § 523(a)(4) is determined by federal law. *Commonwealth Land Title Co. v. Blaszak (In re Blaszak)*, 397 F.3d 386, 390 (6th Cir. 2005) (citing *Carlisle Cashway, Inc. v. Johnson (In re Johnson)*, 691 F.2d 249, 251 (6th Cir. 1982)). The Sixth Circuit Court of Appeals "construes the term 'fiduciary capacity'" more narrowly for purposes of § 523(a)(4) than it does in other circumstances. *Id.* at 391; *see Borg-Warner Acceptance Corp. v. Miles (In re Miles)*, 5 B.R. 458, 460 (Bankr. E.D. Va. 1980) ("The Courts have attempted to avoid making the exception so broad that it reaches such ordinary commercial relationships as creditor-debtor and principal-agent.") (citations omitted). It is noteworthy that the Sixth Circuit states that "[t]he mere failure to meet an obligation while acting in a fiduciary capacity . . . does not rise to the level of defalcation" under § 523(a)(4). *In re Garver*, 116 F.3d at 179. Rather, the requisite fiduciary relationship "turn[s] on the existence of a *pre-existing express or technical trust* whose res encompasses the property at issue." *In re Blaszak*, 397 F.3d at 391 (emphasis added).

Construing the Agreement under Texas law,[5] the bankruptcy court held that the Agreement did not create an express trust and, accordingly, did not give rise to the type of fiduciary relationship required under § 523(a)(4). We agree. Under Texas law, an express trust "is created 'only if the settlor manifests an intention to create a trust.'" *Chapman Children's Trust v. Porter & Hedges, LLP*, 32 S.W.3d 429, 438 (Tex. App. 2000) (quoting Tex. Prop. Code Ann. § 112.002 (Vernon 1995)). Absent ambiguity, this intent is discerned "from the language used in the written declaration or trust instrument." *City of Mesquite v. Malouf*, 553 S.W.2d 639, 643 (Tex. App. 1977). When interpreting a written agreement, Texas law requires courts to "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003) (citing *Univ. C.I.T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 158 (Tex. 1951)). "No single provision taken alone will be given controlling effect; rather all the provisions must be considered with reference to the whole

---

[5] As previously noted, the Agreement states that it is governed by Texas law. The parties have not disputed which law governs.

instrument." *Id.* (citing *Myers v. Gulf Coast Minerals Mgmt. Corp.*, 361 S.W.2d 193, 196 (Tex. 1962)) (additional citation omitted).

As the bankruptcy court correctly noted, paragraph 6 of the Agreement provides that proceeds from collections on the Accounts are to be held by R.R. Fox in a separate trust account "for the benefit of" the Appellant. Standing alone and without reference to the rest of the Agreement, this provision appears to establish an express trust and a resulting fiduciary relationship between R.R. Fox and the Appellant. This language, however, does not stand alone. Paragraph 13 of the Agreement specifically provides that neither party to the Agreement shall be deemed a "fiduciary" "for any purpose whatsoever." This provision supplements and supersedes the "trust" language and explicitly prohibits either party from relying upon the Agreement to establish a fiduciary relationship. Reconciling these two provisions, one may readily discern that paragraph 6 requires R.R. Fox to follow certain contractual practices and procedures in collecting the Accounts. We agree with the bankruptcy court's conclusion that paragraph 6 simply established a contractual obligation for R.R. Fox to maintain a trust account and to segregate funds, while paragraph 13 is determinative of the parties' intent regarding the nature of their business relationship.

This interpretation not only gives meaning to both provisions of the Agreement, but is also consistent with well-settled bankruptcy law. "It is the substance of a transaction, rather than the labels assigned by the parties, which determines whether there is a fiduciary relationship for bankruptcy purposes." *Barclays Am./Bus. Credit, Inc. v. Long (In re Long)*, 774 F.2d 875, 878-79 (8th Cir. 1985) (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S. Ct. 151 (1934)). Accordingly, in an analogous context, the United States Supreme Court has held that an ordinary security agreement does not create a fiduciary relationship for purposes of § 523(a)(4) simply because it uses trust language and imposed trust-like duties upon the debtor. *Davis*, 293 U.S. at 334; *see also In re Miles*, 5 B.R. at 460 (parties may not "cloak" a "transaction in the guise of a trust by the 'magic words' in the agreement, 'in trust;'" "[v]erbal legerdemain does not impose a fiduciary duty on the debtor"). Here, paragraph 13 of the Agreement defined R.R. Fox as an independent contractor, not an agent or fiduciary. The nature of the parties' relationship is not altered by the attempted "magic" trust language in paragraph 6.

Because the Agreement did not create the type of fiduciary relationship between R.R. Fox and the Appellant required under § 523(a)(4), there could be no defalcation by R.R. Fox, and thus

no defalcation by the Debtor.  The bankruptcy court properly rejected the Appellant's defalcation claim.

B.  Embezzlement.

Debts arising from embezzlement or larceny are also excepted from discharge under § 523(a)(4).  The Sixth Circuit has defined embezzlement as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come."  *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996) (citations omitted).  A creditor must prove three elements to establish embezzlement: (1) "that he entrusted his property to the debtor," (2) that "the debtor appropriated the property for a use other than that for which it was entrusted," and (3) that "the circumstances indicate fraud."  *Id.* at 1173 (citing *Ball v. McDowell (In re McDowell)*, 162 B.R. 136, 140 (Bankr. N.D. Ohio 1993)).

The "fraud" required under § 523(a)(4) is "fraud in fact, involving moral turpitude or *intentional* wrong."  *Driggs v. Black (In re Black)*, 787 F.2d 503, 507 (10th Cir. 1986) (quoting *United States Life Title Ins. Co. v. Dohm (In re Dohm)*, 19 B.R. 134, 138 (N.D. Ill. 1982) (additional citations omitted)), *overruled on other grounds by Grogan*, 498 U.S. at 291; *see Neal v. Clark*, 95 U.S. 704, 709, 24 L.Ed. 586 (1877) (noting that "fraud" under a predecessor to § 523(a)(4) required actual, intentional fraud "*as does embezzlement*") (emphasis added); *WebMD Servs., Inc. v. Sedlacek (In re Sedlacek),* 327 B.R. 872, 881 (Bankr. E.D. Tenn. 2005)).  Accordingly, embezzlement claims under § 523(a)(4) require "proof of the debtor's fraudulent intent in taking the [creditor's] property." *Miller v. J.D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 602-03 (5th Cir. 1998) (citing *In re Brady*, 101 F.3d at 1173).  As the *Brady* definition suggests, the debtor's fraudulent  intent may often be shown by circumstantial evidence.  *In re Sedlacek*, 327 B.R. at 880-81 (citations omitted).

The bankruptcy court ruled that the Appellant failed to establish "circumstances indicating fraud."[6]  The court reached this conclusion by utilizing Ohio common law.  *See Burr v. Bd. of County Comm'rs*, 491 N.E.2d 1101, 1105 (Ohio 1986).  Under Ohio law, the elements of fraud are: "(1) a representation or, where there is a duty to disclose, concealment of fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard

---

[6] Because of our subsequent discussion, we need not address whether the Appellant proved the first two elements of embezzlement.

and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation or concealment; and (6) a resulting injury proximately caused by the reliance." *Id*. (citation omitted). Specifically, the bankruptcy court held that the Appellant failed to prove that it relied on any material misrepresentations or omissions allegedly made by the Debtor.

By requiring the Appellant to prove the elements of misrepresentational fraud in support of its embezzlement claim, the bankruptcy court imposed an overly restrictive definition of "circumstances indicating fraud." Fraud comes in many sizes, shapes, and shades of gray. In other contexts, courts have defined "fraud" as "encompass[ing] 'any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another.'" *Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001) (quoting *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000) (citing 4 Lawrence P. King, Collier on Bankruptcy ¶ 523.08[1][e], at 523-45 (15th ed. rev. 2000)). Under this broad definition, a creditor may establish circumstances indicating a debtor's fraudulent intent, even if the debtor did not make a misrepresentation or misleading omission on which the creditor relied.[7] *See Fischer Inv. Capital, Inc. v. Cohen (In re Cohen)*, 334 B.R. 392, 400 n.7 (Bankr. N.D. Ill. 2005); *see also McClellan*, 217 F.3d at 894 (because "reliance is relevant only when a fraud takes the form of a misrepresentation," a creditor need not demonstrate reliance to prove "actual fraud" under § 523(a)(2)(A)).

This is not to say that a debtor's misrepresentations or omissions are irrelevant to the embezzlement analysis. To the contrary, misrepresentations, omissions, or other concealment of a debtor's actions regarding a creditor's property are important circumstances that might pierce the shadows to illuminate a debtor's fraudulent intent. *In re Cohen*, 334 B.R. at 400 n.7 ("Although

---

[7] The restrictive standard utilized by the bankruptcy court is correct when a debtor induces a creditor to part with property, thereby allowing the debtor to abscond with the property. In such instances the fraudulent intent existed from the beginning of the relationship. The proper, broader standard also covers those instances when a debtor is given possession of, or control over, a creditor's property and then decides to wrongfully take the property at some later time. This is often what occurs in the embezzlement context. *See Farley v. Romano (In re Romano)*, 353 B.R. 738, 765 (Bankr. D. Mass. 2006) (Embezzlement is generally defined "'as the fraudulent appropriation of property of another by a person to whom such property has been entrusted or into whose hands it has lawfully come.'") (quoting *Moore v. United States*, 160 U.S. 268, 269, 16 S. Ct. 294 (1895)).

some misrepresentation or omission on the debtor's part will tend to prove intent, . . . neither is a prerequisite. All that must be shown is an intent permanently to deprive another of his property."); *see, e.g., First Del. Life Ins. Co. v. Wada (In re Wada)*, 210 B.R. 572, 577 (B.A.P. 9th Cir. 1997) (debtor travel agent accepted deposit from creditor; when creditor cancelled travel plans, debtor falsely claimed she could not refund approximately $85,000 of creditor's money because it had been used for nonrefundable deposits with airlines and hotels; in fact, the debtor had kept the $85,000; debtor's misrepresentation about the deposits established "circumstances indicating fraud" and all elements of creditor's embezzlement claim were met).

On the other hand, a debtor's fraudulent intent might be negated by circumstantial evidence showing "that the debtor used [the creditor's property] openly, without attempting to conceal, and had reasonable grounds to believe he had the right to so use." *In re Weber*, 892 F.2d 534, 539 (7th Cir. 1989) (debtor did not convert proceeds from sale of creditor's cattle with fraudulent intent, where creditor acquiesced to debtor's continued possession and control of the funds). A debtor might also lack fraudulent intent when his "dominant motivation" in misappropriating the creditor's property is to benefit his own corporation and help the business survive, rather than to harm the creditor. *See Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 556 (9th Cir. 1991) (corporate officers of appliance sales and service business did not intend to defraud bank when they commingled funds and failed to remit sales proceeds to bank in violation of security agreement; at all times, the officers' primary intent was to see their business succeed).

The bankruptcy court closely examined the circumstances surrounding the Debtor's actions in this case and determined that they did not indicate that the Debtor acted with the intent to defraud the Appellant. Overall, the record establishes that the Debtor acted openly rather than hiding or concealing the failure to segregate the downloaded Accounts in a separate trust account. Although the Appellant views the actions of the Debtor as highly suspicious, the circumstances fail to show any artifice, wrongful scheme, or clever plan of fraud. The bankruptcy court's findings are not clearly erroneous in this regard and the findings support the conclusion that the Appellant failed to prove its embezzlement claim.[8] *See In re Vitanovich*, 259 B.R. at 878 (findings of intent to defraud are reviewed on appeal for clear error).

_____

[8] The bankruptcy court made some of these factual findings regarding the Debtor's intent in its § 523(a)(6) analysis. The findings apply with equal force to the Appellant's embezzlement claim.

First, although R.R. Fox failed to hold the proceeds from the Accounts in a segregated bank account as required by the Agreement, the court found, based on the Debtor's uncontroverted testimony, that the Debtor attempted to open a trust account and thought he had a surety bond. Further, the evidence established that the Appellant continued to download Accounts to R.R. Fox, despite its knowledge that no trust account was in place. These actions reinforced the Debtor's mistaken belief that he had sufficiently complied with the Agreement. More importantly, the Appellant's knowledge that no trust account existed contradicts its assertion that the Debtor concealed its commingling of funds in a way that suggested an intent to defraud the Appellant. Under the circumstances of this case, the Debtor's failure to maintain the segregated account does not support the Appellant's allegation that the Debtor acted with fraudulent intent.

There is likewise no evidence that the Debtor made the three $20,000 withdrawals with the intent to deprive the Appellant of its property.[9] Although the Debtor's testimony regarding the reason for the withdrawals was somewhat inconsistent and hence suspicious, the discrepancies in the testimony do not establish that the Debtor acted with the intention of harming the Appellant. To the contrary, the bankruptcy court found that the timing and manner of the withdrawals were consistent with the Debtor's testimony that he was progressively recouping the capital contributions he made to R.R. Fox. This finding is supported by the record.

Finally, the bankruptcy court found that most of the proceeds from the Accounts were spent by the Debtor in an effort to maintain R.R. Fox's business viability. The Debtor's uncontroverted testimony was that R.R. Fox incurred significant overhead during the relevant time period because it was aggressively trying to expand its business operations. As the court explained: "although the [Debtor] converted [the Appellant's] funds, he did so with the intent of keeping R.R. Fox afloat, and, incidentally, benefitting [the Appellant] by continuing to collect on its Accounts." (J.A. at 172.)

---

[9] In fact, as a preliminary matter, the court found that the Appellant failed to establish that the withdrawals were related to funds collected from its Accounts. The first withdrawal was made prior to the Appellant's first download of Accounts. The second withdrawal, according to the Debtor, was based upon accounts he owned personally, and the Appellant offered no evidence to the contrary. Because the Appellant failed to show what amount R.R. Fox collected on the Appellant's Accounts in February 2003, there was also no way to determine if the third withdrawal involved proceeds from the Accounts. Regardless of intent, the Appellant lacked adequate proof that the Debtor took its property.

This finding further supports the bankruptcy court's conclusion that the Debtor lacked an intent to defraud the Appellant.

Because the bankruptcy court ultimately concluded that the Debtor did not intend to defraud the Appellant, its dismissal of the Appellant's embezzlement claim was proper.

C. Willful and Malicious Injury.

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). For a debt to be nondischargeable under § 523(a)(6), the alleged injury must be both willful and malicious. *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir. 1999).

An act will be deemed "willful" only if it was undertaken with the actual intent to cause injury. *Id.* at 464. The requisite intent exists when the debtor "desires to cause [the] consequences of his act, or . . . believes that the consequences are substantially certain to result from it." *Id*. In this sense, § 523(a)(6) requires a debtor to commit an act akin to an intentional, rather than negligent or reckless tort. *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S. Ct. 974 (1998). "Intentional torts generally require that the actor intend 'the *consequences* of an act,' not simply 'the act itself.'" *Id*. (citing Restatement (Second) of Torts § 8A cmt. a (1964)) (emphasis in original). An act is "malicious" if is it is undertaken "in conscious disregard of one's duties or without just cause or excuse." *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986). "Malicious" acts do "not require ill-will or specific intent to do harm." *Id*.

The bankruptcy court held that the Debtor's conversion[10] of the Appellant's funds was not "willful" for purposes of § 523(a)(6). Specifically, the court found no evidence that the Debtor failed to establish the segregated account with the intent to injure the Appellant or with knowledge that such injury was substantially certain to occur. The Debtor's uncontroverted testimony established that he attempted to set up the separate trust account as required by the Agreement. Gerlosky's testimony revealed that the Appellant continued to download Accounts to R.R. Fox, despite its knowledge that neither the trust account nor the surety bond was in place. Further, the evidence at trial suggested that most of the proceeds from the Accounts were spent by the Debtor

---

[10] (J.A. at 172.) For purposes of this appeal, we will assume a conversion took place.

in an effort to keep R.R. Fox in business. Again, the Debtor's uncontroverted testimony was that R.R. Fox incurred significant overhead during the time period in question because it was aggressively trying to expand its operations. The Debtor's attempts to keep R.R. Fox in business and expand its operations suggest he intended to benefit, rather than harm, the Appellant by continuing to collect on its Accounts. Finally, the court found no evidence that the Debtor intended to injure the Appellant when he made the three $20,000 withdrawals from R.R. Fox's general operating account. Contrary to the Appellant's assertions, the Debtor's somewhat inconsistent testimony regarding the withdrawals does not compel the conclusion that the Debtor acted with the intention of harming the Appellant. The court found that the Debtor's periodic withdrawal of these funds at the beginning of each month was consistent with the Debtor's testimony that he was progressively recouping the capital contributions he made to R.R. Fox.

Overall, we agree with the bankruptcy court's conclusion that, at most, the Debtor was negligent in the way he conducted business at R.R. Fox. Mere negligence is not sufficient to except a debt from discharge under § 523(a)(6). Because the Appellant did not establish that the Debtor converted its funds with the intent to harm the Appellant, or with the requisite certainty that such harm was likely to occur, the bankruptcy court properly rejected the Appellant's willful and malicious injury claim.

## V. CONCLUSION

For the foregoing reasons, the judgment of the bankruptcy court is AFFIRMED.


JENNIE D. LATTA, Bankruptcy Appellate Panel Judge, concurring. Because I concur in the result reached by the other members of the Panel, but not in the analysis used to reach it, I have prepared this separate opinion.

The facts of this case are relatively straightforward. R.R. Fox entered into a contract with the Appellant, Cash America, to provide collection services on accounts generated by Cash America. Pursuant to the terms of the contract between them, R.R. Fox was required to follow certain procedures in the handling of proceeds of these accounts and was to remit the proceeds of its efforts

net of its fee to Cash America by the fifth day of the following calendar month. R.R. Fox did not follow the procedures set out in the contract for the segregation of accounts and proceeds, but this fact was known to Cash America *before* it delivered accounts to R.R. Fox for collection. R.R. Fox remitted payment to Cash America for the first month of collections approximately thirty days late. Prior to the due date for the second month's payment, Cash America stopped assigning accounts to R.R. Fox for collection. The business of R.R. Fox failed, and it filed a petition for relief under Chapter 11 on April 4, 2003. The case was later converted to Chapter 7.

The Appellee in the present appeal, the Debtor, was the president, chief operating officer, director, and 50% shareholder of R.R. Fox. He made decisions on behalf of R.R. Fox and was responsible for the relationship with Cash America. During the relevant period, he received three monthly payments of $20,000 each, which he characterized variously as returns on his investment and consulting fees.

The bankruptcy court stated that in order for any obligation to Cash America to be excepted from discharge, Cash America must demonstrate that R.R. Fox committed a corporate tort, that the Debtor was responsible for the commission of that tort, and finally that the Debtor's particular tortuous conduct fell within one of the exceptions to discharge set forth at section 523(a) of the Bankruptcy Code. Rather than following this analysis, however, the bankruptcy court and the other members of this Panel move directly into a discussion of various exceptions to discharge. Nowhere does the bankruptcy court identify a corporate tort committed by R.R. Fox. Instead, both the bankruptcy court and the other members of the Panel hold that the failure of R.R. Fox to segregate the funds of Cash America and to pay it breached the contract between them. I agree with that analysis. The liability of R.R. Fox to Cash America arises from the breach of the contract between them, and is measured according to the terms of that contract.

Where the other members of the Panel and I do not agree is as to the implications of that determination. Once we have said that the liability of R.R. Fox to Cash America arises from their contract, then we have effectively excluded any claim sounding in tort. Generally, "'the existence of a contract action . . . excludes the opportunity to present the same case as a tort claim.'" *Textron Fin. Corp. v. Nationwide Mut. Ins.*, 115 Ohio App. 3d 137, 152, 684 N.E.2d 1261, 1270 (Ohio Ct. App. 1996), quoting *Wolfe v. Cont'l Cas. Co.*, 647 F.2d 705, 710 (6th Cir. 1981). Further,

A tort claim based upon the same actions as those upon which a claim of contract breach is based will exist independently of the contract action only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed.

*Id.*, citing *Battista v. Lebanon Trading Ass'n*, 538 F.2d 111, 117 (6th Cir. 1976). The only obligations between R.R. Fox and Cash America arose from the contract between them. No basis upon which an independent cause of action for breach of duty was articulated or demonstrated by Cash America. In fact, the contract between them explicitly foreclosed this possibility, as pointed out by the other members of the Panel.

Thus, the bankruptcy court's finding that the Debtor *converted* the funds of Cash America is an anomaly. It is inconsistent with its prior determination that R.R. Fox breached its contract with Cash America. Conversion is a common law tort having to do with the unlawful taking or retention of *tangible* personal property. It is the civil analog of the criminal actions of robbery and larceny.[11] While the action for conversion has been extended in recent times to include the unlawful taking or retention of *intangible* personal property under certain conditions, it cannot be the case that the actions of R.R. Fox give rise to a claim for breach of contract while the very same actions (viewed as the actions of the Debtor) give rise to a claim for damages sounding in tort.

If the Debtor is to be made personally liable for the *contractual* obligations of R.R. Fox, it must be either because he bound himself to Cash America as an individual or for some reason having to do with the Debtor's failure to observe corporate formalities. Under Ohio law, "[a]n officer of a corporation is not personally liable on contracts . . . for which his corporate principal is liable, unless he intentionally or inadvertently binds himself as an individual." *Dietz-Britton v. Smythe, Cramer Co.,* 139 Ohio App.3d 337, 352, 743 N.E.2d 960, 971 (Ohio Ct. App. 2000); citing, *Centennial Ins. Co. of N.Y. v. Vic Tanny Int'l of Toledo, Inc.*, 46 Ohio App.2d 137, 142, 346 N.E. 2d 330, 334 (Ohio Ct. App. 1975). This holds true even if the corporate principal's liability is founded on a corporate misdeed unless the evidence supports piercing the corporate veil. *Carter-*

---

[11] For an excellent discussion of the history of the rise and development of the action of conversion, see *Thyroff v. Nationwide Mut. Ins. Co.*, 8 N.Y.3d 283, 2007 N.Y. Slip Op. 02442 (N.Y. March 22, 2007).

*Jones Lumber Co. v. Dixie Dist. Co.*, 166 F.3d 840, 847 (6th Cir. 1999). In order to pierce the corporate veil or disregard the corporate form under Ohio law so that an individual shareholder may be held liable for corporate misdeeds, it is necessary to show that,

> (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

*Id.*, quoting, *Belvedere Condo. Unit Owners' Ass'n v. R. E. Roark Cos., Inc.*, 67 Ohio St.3d 274, 289, 617 N.E. 2d 1075, 1086 (Ohio App. 1993).

There has been no showing in this case that the Debtor intentionally or inadvertently bound himself to be personally liable for the contractual obligations of R.R. Fox. Further, the closest that Cash America has come to articulating grounds for disregarding the corporate form is to point to the draws taken by the Debtor in the first three months of R.R. Fox's operations. Cash America failed, however, to show that these withdrawals were unauthorized or unreasonable given the expectations for the future of R.R. Fox and its capital structure. This was the finding of the bankruptcy court, which is not clearly erroneous. Thus, Cash America has failed to demonstrate that the Debtor may be held personally liable for the contractual obligations of R.R. Fox. Even if it had, it is yet another step, of course, to show that the personal liability of the Debtor to Cash America should be excepted from discharge.

Once the Panel and the bankruptcy court determined, as a matter of law, that the liability of R.R. Fox to Cash America was solely a contractual liability, and that there was no basis to hold the Debtor personally liable for the contractual obligations of the company, their analysis should have stopped. I agree with the ultimate conclusion of the bankruptcy court, and thus agree with the Panel that the decision of the bankruptcy court should be affirmed, but for the narrow reasons that I have articulated.