**In re Gerald R. SALUPO, Jr. and Roseann Salupo, Debtors.**

**Nancy Hamerly et al., Plaintiffs,**

**v.**

**Gerald R. Salupo, Jr. et al., Defendants.**

**Bankruptcy No. 06–16347.**
**Adversary No. 07–1139.**

United States Bankruptcy Court,
N.D. Ohio,
Eastern Division.

May 5, 2008.

James T. Dixon, Matthew H. Matheney, Frantz Ward LLP, Cleveland, OH, for Plaintiffs.

Stephen D. Hobt, Cleveland, OH, for Defendants.

### MEMORANDUM OF OPINION AND ORDER

RANDOLPH BAXTER, Bankruptcy Judge.

In a ten-count complaint ("Complaint"), co-plaintiffs Paul and Nancy Hamerly ("Hamerlys") seek to have a home construction related debt determined to be nondischargeable under §§ 523(a)(2), (4) and (6) of the Bankruptcy Code. *11 U.S.C. 523(a)(2), (4) and (6).* Co-debtors/co-defendants, Gerald and Roseann Salupo ("Debtors") formally responded with a general denial to the Complaint's allegations. Upon a duly noticed trial proceeding, an examination of the evidence adduced, and a review of the record, generally, the following factual findings and conclusions of law are hereby rendered:

\*

On December 18, 2006, the Debtors filed their joint petition for voluntary relief under Chapter 7 of the Bankruptcy Code. Gerald Salupo ("Salupo") is the President and holder of 33 1/3% of the shares of J & M Salupo Development Co., Inc. which does business under the trade name of J & M Salupo ("J & M Salupo")[1]. Prepetition,

---

1. Salvatore D. Salupo is the Vice President and Sandra M. Salupo is the Treasurer of J & M Salupo Development Co., Inc. Each holds 33 1/3% of the common stock in the company. These two shareholders and the corporation, itself, are also the subject of bankruptcy filings in this District.

between 2001 and 2002, the Hamerlys contacted Salupo, to obtain his services in constructing a custom-built residence for them. This resulted in the parties executing a construction purchase agreement (the "Purchase Agreement") accompanied by a new home construction conditions agreement (the "Conditions Agreement") on January 18, 2002 (*See,* Exhibits 3 and 4) wherein Salupo agreed to build a home for them at a cost of $575,000.00 in the Four Seasons development located in Brecksville, Ohio (the "Property").

With construction loan proceeds earlier obtained by Salupo from Fifth Third Bank for construction of a "spec" home, (*See,* Exhibits 1, 2, 6 and 7), J & M Salupo commenced construction of the Hamerlys home for the agreed upon price. It is undisputed that the Hamerlys used those loan proceeds, at Salupo's encouragement, to avoid their having to obtain separate construction loan financing.

Construction commenced in April 2002, with an anticipated nine-month construction period. P. Hamerly, Direct. Through various change orders and extensions, the home was actually completed within a 15–month period. *Id.; see also,* Exhibit 5. Although a "punch list" had not been satisfied and no closing occurred, Salupo allowed the Hamerlys to take occupancy of the home in June of 2003 [2]. *Id.;* G. Salupo, Direct and Cross. Without interruption, the Hamerlys continue to reside on the subject premises to the present time. *Id.*

\* \*

The Hamerlys contend that the Debtors, on behalf of J & M Salupo, executed an Open–End Mortgage with Fifth Third Bank for $703,700.00, secured by the Property in September 2001. To obtain this loan, they argue that Salupo represented to Fifth Third Bank that he would construct a home that was larger than the home he later contracted to build for them. *See,* Exhibits 1 and 2. Subsequently, they entered into a construction agreement for J & M Salupo to build a custom home on the Property. *See,* Exhibit 3. The Hamerlys state that Salupo did not disclose to them the amount of the loan with Fifth Third Bank, secured by the Property. The Hamerlys further contend that such information was material to their execution of a construction agreement, that Salupo should have disclosed the existence of the loan, and the failure to so disclose was intentional.

The Hamerlys assert that the Debtors have conceded liability by their failure to respond timely to the requests for admissions ("RFA's"). They argue that they have suffered damages in excess of $250,000.00 because, *inter alia,* they 1) paid $180,000.00 towards the purchase of the Property for which Salupo did not deliver clear title, 2) will lose equity [3] in the Property in an amount greater than $70,000.00, and 3) lost the opportunity to obtain a mortgage at a more favorable rate. *See,* Exhibit 16. Additionally, they contend that, because it was Salupo who made the misrepresentations and concealed material facts, he is personally liable for the harm caused. Therefore, the Hamerlys seek a determination that the damages summarized on Exhibit 16 are a debt owed to them by Salupo which is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and/or (a)(6).

---

**2.** On or about June 13, 2003, Salupo, by his signature, acknowledged receipt of the settlement statement showing that $213,480.55 was needed from J & M Salupo for closing to occur. *See,* Exhibit 21.

**3.** The Hamerlys obtained an appraisal of the Property in 2006 for a value of $645,000.00.

The Debtors deny the Complaint allegations and argue that there is no debt obligation owed to the Plaintiffs on which a determination of dischargeability can be made in this case. The Debtors contend that, if there is a debt obligation, it exists between J & M Salupo and the Plaintiffs, and not from Salupo, personally. They further assert that the Hamerlys are not liable on the construction loan with Fifth Third Bank and did not obtain their own mortgage loan to purchase the Property. Additionally, Defendants argue, although the Hamerlys made installment payments toward the purchase of the Property in the sum total of $180,000.00, and paid $60,827.47 for improvements to the Property, they have made no other payments for residing in the Property for nearly five years and owe approximately $80,000.00 to Salupo for additional construction.

\* \* \*

The issue before this Court is whether there exists a basis for nondischargeability of the subject indebtedness pursuant to §§ 523(a)(2)(A), (a)(4), and/or (a)(6).

\* \* \* \*

Title 11 U.S.C. § 523 identifies certain types of debt that are exceptions to discharge. At issue in this proceeding are subsections (a)(2)(A), (a)(4), and (a)(6) which state the following:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

*11 U.S.C. § 523(a)(2)(A), (a)(4) and (a)(6).*

\* \* \* \*

■ Herein, the Plaintiffs timely filed their complaint to determine dischargeability on March 26, 2007. Pursuant to Federal Rule of Bankruptcy Procedure 4005, in a trial on a complaint objecting to a discharge, the plaintiff has the burden of proving that a discharge is unwarranted. *Fed. R. Bankr.P. 4005.* The party seeking to have a debt declared nondischargeable bears the burden of proving by a preponderance of the evidence that the debt falls within one of the statutory exceptions. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

Among the provisions of the Construction Conditions Agreement (Exhibit 4), accompanying the Purchase Agreement (Exhibit 3), the following was included, in pertinent part:

The Builder shall deliver or cause to be delivered to Buyer title to said premises by good and sufficient warranty deed, free and clear of all liens and encumbrances. . . . If a defect in title appears, Builder shall have thirty (30) days after notice to remove the defect. If Builder is unable to remedy said defect in a timely manner, Buyer may elect to terminate this Agreement and receive a refund of any deposit made by Buyer.

Exhibit 4–4. It is undisputed that prepetition, and pursuant to the Purchase Agreement, the Hamerlys made installment payments to J & M Salupo in the sum total of $180,000.00. *See,* Exhibit 17. Additionally, the Hamerlys made payments directly to certain subcontractors hired by them for work beyond the Purchase Agreement totaling $60,827.47. *See,* Exhibit 19.

The Hamerlys did not receive clear title to the Property and were not refunded their deposit. Therefore, the Hamerlys assert a claim against Salupo for breach of contract, described on Schedule F of the Debtors' personal bankruptcy petition as a "corporate obligation of J & M Salupo only". Debtors' Schedule F at p. 5. The amount of the claim is marked "Unknown". *Id.* The Hamerlys contend that they have suffered damages in excess of $250,000.00, plus attorney fees, as a result of the Salupos' conduct. *See,* Exhibit 16.

During the discovery period, written admissions requests were served upon Salupo on June 8, 2007. He did not respond to these requests timely, nor did he seek leave of this Court, in accordance with Fed.R.Civ.P. 36, which provides, in pertinent part, that:

> (a) Request for Admission.
>
> Each matter of which an admission is requested ... is admitted unless, within 30 days after service of the request, or within such shorter or longer time as the court may allow or as the parties may agree to in writing, ... the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter, signed by the party or by the party's attorney.

*Fed.R.Civ.P. 36(a).* The Defendant acknowledges that the effect of Rule 36 makes the admissions that the Plaintiffs' requested admitted.

Co–Defendant, Roseann Salupo, filed a motion to dismiss the Complaint as it relates to her in its entirety. Co-defendant, Gerald Salupo, Jr. also filed a motion to dismiss with regard to counts III, IV, V, and VI of the complaint which allege fraudulent conveyance of property and assets, engaging in a pattern of corrupt ac-

tivity, breach of contract, and violations of the consumer sales practices act, respectively. By stipulation, both dismissal motions were granted. The only remaining complaint allegations were for exceptions to dischargeability pursuant to §§ 523(a)(2)(A), (a)(4), and/or (a)(6).

Plaintiffs first seek to have the subject debt declared nondischargeable pursuant to § 523(a)(2)(A). Section 523(a)(2)(A) provides, in pertinent part, that a discharge in bankruptcy does not discharge an individual from any debt to the extent that such debt is obtained by "false pretenses, a false representation, or actual fraud...." *Grogan v. Garner,* 498 U.S. at 281, 111 S.Ct. 654. To establish a *prima facie* claim pursuant to § 523(a)(2)(A), the following elements must be proven:

> (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth;
>
> (2) the debtor intended to deceive the creditor;
>
> (3) the creditor justifiably [4] relied on the false representation; and
>
> (4) its reliance was the proximate cause of loss.

*Longo v. McLaren (In re McLaren),* 3 F.3d 958, 961 (6th Cir.1993); *see also In re Baker,* 298 B.R. 815, 818 (Bankr.S.D.Fla. 2003) (citations omitted).

In support of their Complaint allegations, the Hamerlys offered their sworn testimony. Their testimony was credible and was bolstered by the admissions of Salupo and the evidence adduced. Mr. Hamerly testified that he and his wife offered to fund the construction on the Property and Salupo told them that "he would obtain a better rate than we could

---

**4.** The U.S. Supreme Court held in *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) that " § 523(a)(2)(A) re-

quires justifiable, but not reasonable, reliance." *Field v. Mans,* 516 U.S. 59, 74–5, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

because he had a good relationship with [Fifth Third] bank." P. Hamerly, Direct. He further testified that at no time before the Hamerlys executed the Purchase Agreement did Salupo inform them that this loan from Fifth Third Bank was for $703,700.00, that he had already drawn $213,231.13 against it, or that it was secured by the Property. *Id.;* RFA 15, 19, 21, 23; Exhibit 6. Salupo admits that he obtained the Fifth Third Bank Loan by representing to Fifth Third Bank that he would build a home that was larger than the home he later agreed to construct for the Hamerlys. RFA 15. Salupo also admitted that he had a duty to disclose this information to the Hamerlys. RFA 16, 18, 20, 22. The failure to disclose this information was material to the Purchase Agreement and was done with the intent to mislead the Hamerlys into relying upon the failure to disclose. P. Hamerly, Direct; RFA 42, 43. The Hamerlys relied on the representation of Salupo that he would deliver clear title for the Property. *Id.* The Conditions Agreement attached to the Purchase Agreement stated that "The Builder shall deliver or cause to be delivered to Buyer title to said premises by good and sufficient warranty deed, free and clear of all liens and encumbrances, whatsoever...." P. Hamerly, Direct; Exhibit 4, p. 4–4 at paragraph 6. This representation was material to the Purchase Agreement and was made with the intent to mislead the Hamerlys into relying upon it. RFA 31, 40, 41. The Hamerlys would not have entered into the Purchase Agreement if they had known the amount of the Fifth Third Bank Loan and Salupo's inability to deliver clear title to them. P. Hamerly, Direct.

On or about June 19, 2003, Salupo executed an "Acknowledgment and Receipt of Settlement Statement." *See,* Exhibit 21. He signed his name below the statement "I have carefully reviewed the HUD–1 Settlement Statement and to the best of my knowledge and belief it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction." *Id.* at 21–1. The Settlement Statement indicated that J & M Salupo owed $609,656.67 under the Fifth Third Bank Loan and, even after receiving first mortgage funds of $300,700.00, second mortgage funds of $28,020.86, and cash of $111,654.89 from the Hamerlys, J & M Salupo needed to pay $213,480.55 to fund the closing. *Id.* at 21–3; P. Hamerly, Direct.

Salupo admits that he obtained more funds than were needed to cover the expenses of the project from the Hamerlys' payments and the draws he made against his Fifth Third Bank Loan. RFA 33. He also admits that he did not pay any principal, interest or fees under the Fifth Third Bank Loan. RFA 36. He further admits that he had a duty to disclose this fact to the Hamerlys. RFA 37. The Hamerlys were not provided title to the Property "by good and sufficient warranty deed, free and clear of all liens and encumbrances, whatsoever." Salupo admitted that he was unable to deliver clear title to the Hamerlys because he had borrowed more under the Fifth Third Bank Loan than he would receive under the subject Purchase Agreement. RFA 32, 38. As he testified at trial, "I knew that, yes, the construction loan had exceeded what the funds that we had coming." G. Salupo, Cross. He admitted that the Hamerlys were justified in relying upon his misrepresentations and that their reliance proximately caused damage to them. RFA 44, 45, and 48; *see also,* P. Hamerly, Direct. He also admitted that he made those misrepresentations with knowledge of their falsity or with utter disregard and recklessness about their falsity. RFA 50. He further admitted that his actions with regard to the Hamerlys on the construction project constitute an exception to discharge as set

forth in 11 U.S.C. §§ 523(a)(2) and (6). RFA 50.

Salupo has presented the Court with nothing to refute the Hamerlys' contentions. Although Salupo argues that the real estate transaction with the Hamerlys did not close because the Hamerlys owed him approximately $80,000.00 for additional construction, he provided the Court with no documentation to support this allegation. *See,* G. Salupo, Cross. Even if this amount was owed, more than $133,000.00 in additional money was needed to close the transaction. *See,* Exhibit 21, p. 21–3.

■■ At all times pertinent to the subject transaction, Salupo was the President of J & M Salupo. Yet, he contends that any debt owed to the Hamerlys arose from a transaction with J & M Salupo and not him, personally. As the President of the company, Salupo was an officer and agent of J & M Salupo. Typically, corporate law principles shield officers and directors, like Salupo, from personal liability for the debts or actions of the separate corporate entity. *Belvedere Condo. Unit Owners' Ass'n v. R.E. Roark Cos.,* 67 Ohio St.3d 274, 1993 Ohio 119, 617 N.E.2d 1075, 1085 (Ohio 1993). There are exceptions, however, for when the corporate veil is pierced, *Id.,* or when the officer is a participant in the wrongful act as an agent of the company. *Carter–Jones Lumber Co. v. Dixie Distrib. Co.,* 166 F.3d 840, 846 (6th Cir. 1999); *see also, Cash Am. Fin. Serv. v. Fox (In re Fox),* 370 B.R. 104, 113 (6th Cir. BAP 2007) *citing State ex rel. Fisher v. Am. Courts, Inc.,* 96 Ohio App.3d 297, 644 N.E.2d 1112, 1114 (Ohio App.1994) (*citing Young v. Featherstone Motors,* 97 Ohio App. 158, 124 N.E.2d 158, 165–66 (1954)) (noting the distinction from alter ego liability). "Ohio law has long held that corporate officers may be held personally liable for actions of the company if the officers take part in the commission of the act or if they specifically directed the par-

ticular act to be done, or participated or cooperated therein." *Id.*

■ Herein, Salupo received $180,000.00 from the Hamerlys through several material misrepresentations that he personally made, including: 1) that he would obtain better financing than they would, 2) that he had a good relationship with Fifth Third Bank, and 3) that he would deliver clear title for the Property to them. Salupo knew his representations to the Hamerlys were false because he had obtained a loan from Fifth Third Bank in the amount of $703,700.00 to build a home that was larger than the home he later agreed to construct for the Hamerlys; he owed more on the Fifth Third Bank loan than he would receive from the Hamerlys; and he would be unable to close the real estate transaction due to the amount owed. Salupo admitted that he made the representations with the intent to mislead the Hamerlys into relying upon them. RFA 42, 43. Under these circumstances, the Hamerlys were justified in relying on Salupo's representations and such reliance was reasonable. Salupo had constructed other homes in the same area. P. Hamerly, Direct. He had completed other small construction projects for the Hamerlys in the past. *Id.* The Supreme Court has noted that there is no duty for a purchaser to investigate or verify, in the absence of anything that would arouse suspicion. *Field v. Mans,* 516 U.S. 59, 74–5, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). The reliance on Mr. Salupo's misrepresentations was the proximate cause of the Hamerlys damages. P. Hamerly, Direct. Mr. Hamerly testified that he "would have chosen not to go forward with the project" or "would have hired another builder" if he had known that Salupo would not be able to deliver clear title to the Property. *Id.* Thusly, the Hamerlys have satisfied the elements required to establish an excep-

tion to discharge pursuant to § 523(a)(2)(A) of the Bankruptcy Code by a preponderance of the evidence.

■■■ Additionally, the Plaintiffs seek a determination of nondischargeability pursuant to § 523(a)(4) of the Bankruptcy Code. Section 523(a)(4) provides, in pertinent part, that a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" is excepted from discharge. *11 U.S.C. § 523(a)(4)*. To prevail under the fraud or defalcation provision, the Plaintiffs must prove: 1) the existence of an express trust status to the property at issue; 2) the Defendant was acting in a fiduciary capacity; and 3) the alleged debt arose from the Defendant's fraud or defalcation while acting in a fiduciary capacity. *Capitol Indem. Corp. v. Interstate Agency, Inc. (In re Interstate Agency)*, 760 F.2d 121, 124 (6th Cir.1985). The *Interstate Agency* court defined defalcation as "encompassing embezzlement, the 'misappropriation of trust funds held in any fiduciary capacity,' and the 'failure to properly account for such funds.'" *Id.* at 125.

■■■ Under Ohio law, an express trust is "a fiduciary relationship with respect to property, arising as a result of a manifestation with intention to create it and subjecting the person in whom the title is vested to equitable duties to deal with it for the benefit of others." *Gabel v. Richley*, 101 Ohio App.3d 356, 362–63, 655 N.E.2d 773 (1995). (internal quotations omitted). In order to establish the existence of an express or technical trust under Ohio law, therefore, a Plaintiff must show: "1) an intent to create a trust; 2) a trustee; 3) a trust res; and 4) a definite beneficiary." *In re Blaszak*, 397 F.3d 386, 391 (6th Cir.2005). An express trust can be inferred from the circumstances of the case:

> To constitute an express trust, there must either be explicit language to that effect or circumstances which show with reasonable certainty that a trust was intended to be created. No particular form of words, however, is required to create a trust, and whether one exists is to be ascertained from the intention of the parties as manifested by the words and the circumstances of the particular case. If it appears to be the intention of the donor, from the whole instrument creating it, or by his expressions and conduct at the time, that the property conveyed is to be held or dealt with for the benefit of another, a court of equity will affix to the conveyance the character of a trust; and in determining whether or not a trust has been created there must be taken into consideration the situation and relation of the parties and the character of the property and the purposes which the settlor had in view in making the declaration.

*Jones v. Luplow*, 13 Ohio App. 428, 431–32 (1920).

Herein, no evidence of an express trust was presented. The Plaintiffs did not provide testimony or other documentary evidence to support a finding of an express trust. Thus, Plaintiffs are unable to sustain the burden of proving a claim for fraud or defalcation while acting in a fiduciary capacity. Notwithstanding, the Plaintiffs also seek a finding of nondischargeability with regard to embezzlement and larceny, pursuant to § 523(a)(4).

■■■ For purposes of § 523(a)(4), embezzlement is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *In re Brady*, 101 F.3d 1165, 1172–73 (6th Cir.1997). To prevail on a claim of embezzlement, a plaintiff must show that it entrusted property to a defendant, that the defendant appropriated the property for a use other than that for which it was en-

trusted, and that the defendant did so in circumstances indicating fraud. *See Cash America Financial Services, Inc. v. Fox (In re Fox), supra.*

Herein, Salupo lawfully received funds, on behalf of J & M Salupo, in the amount of $180,000.00 from the Plaintiffs pursuant to their Purchase Agreement. However, no evidence has been presented to show that Mr. Salupo used the funds for a purpose other than that for which it was entrusted. The custom home was ultimately built and the Hamerlys occupy it. Thus, Plaintiffs are unable to sustain the burden of proving a claim for embezzlement.

 Similarly, the Plaintiffs are unable to support a claim of larceny. Larceny, pursuant to § 523(a)(4), requires that the debtor wrongfully and with fraudulent intent takes property from its owner. *In re Rose,* 934 F.2d 901 (7th Cir.1991). Here, the Hamerlys made payments to Salupo pursuant to a Purchase Agreement. That no closing took place does not prove by a preponderance of the evidence that larceny occurred. Thus, the Plaintiffs have not satisfied the requirements for an exception to discharge pursuant to § 523(a)(4) of the Bankruptcy Code.

 The Plaintiffs also seek a determination of nondischargeability pursuant to § 523(a)(6) of the Bankruptcy Code. It is well established that, for nondischargeability to apply under § 523(a)(6), the resulting harm must have been intended, subjectively, by the debtor's conduct, as opposed to negligence or recklessness. *See, Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998); *accord, In re Markowitz,* 190 F.3d 455 (6th Cir.1999). Salupo admitted that this debt is not dischargeable under § 523(a)(6) of the Bankruptcy Code. RFA 51. At trial, he testified, credibly, that "[he] thought we could close [the deal] and ... work things out with the Hamerlys. I had other rela-

tionships with them...." G. Salupo, Cross. Absent proof of the requisite subjective intent to cause the resulting harm, the Hamerlys have not demonstrated that the debt resulting from the builder's inability to deliver clear title is also nondischargeable under 11 U.S.C. § 523(a)(6).

 Notwithstanding, having found that the Hamerlys have satisfied the elements required to establish an exception to discharge pursuant to § 523(a)(2)(A) of the Bankruptcy Code by a preponderance of the evidence, the subject debt is nondischargeable. The subject debt arises from a default pursuant to a provision of the Construction Conditions Agreement (Exhibit 4), accompanying the Purchase Agreement (Exhibit 3). The remedy available for this default is "a refund of any deposit made by Buyer". Exhibit 4–4. Salupo has not refunded the Hamerlys' deposits and these deposits constitute a debt owed to the Hamerlys that is nondischargeable.

Additionally, the Hamerlys claim damages as follows: 1) payments made to subcontractors directly for additional improvements to the Property beyond the Purchase Agreement, 2) lost tax deduction for mortgage interest, 3) lost equity, and 4) replacement cost. *See,* Exhibit 16. The Hamerlys acknowledge that while they lost these potential benefits from the Property, they also avoided certain obligations including paying mortgage interest and real estate taxes. The record is silent, however, as to whether the Hamerlys asserted their right to terminate the Purchase Agreement and obtain a refund of their deposit when it became apparent that Salupo would be unable to transfer clear title. Although the Hamerlys provided a list of expenses incurred for personal additions they made to the Property, a copy of their mortgage loan approval letter, mortgage amortization tables, real

estate property tax history for the Property, and an unauthenticated appraisal of the Property obtained in 2006, it is undisputed that the Hamerlys have occupied the Property since June 13, 2003 without making a regular mortgage payment for nearly five years. The record also does not reflect that the Hamerlys actually incurred mortgage interest on an executed loan, were liable for real estate property taxes on the Property, or would have realized any equity in a sale of the Property. That the Hamerlys voluntarily made improvements to the Property beyond what was agreed to between them and Salupo without having clear title to the Property was done at their own risk. Furthermore, the Hamerlys have not demonstrated any effort to mitigate their damages. They have occupied a home without having title to the Property and without making a single mortgage payments for nearly five years.

\* \* \* \* \* \*

Accordingly, the debt to the Hamerlys as a result of Mr. Salupo's conduct is hereby found to be nondischargeable to the extent of $180,000.00, representing deposits made pursuant to the Purchase Agreement. Each party is to bear its respective costs.

**IT IS SO ORDERED.**

### *JUDGMENT*

At Cleveland, in said District, on this *5th* day of May, 2008.

A Memorandum of Opinion and Order having been rendered by the Court in this matter, IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the subject debt is hereby found to be nondischargeable to the extent of $180,000.00, representing deposits made pursuant to

the Purchase Agreement. Each party is to bear its respective costs.

**IT IS SO ORDERED.**